Judge Lynch, as you were pointing out, the ADHD studies are more uniform, so I think the district court's opinion rises or falls with its analysis of Dr. Ness's genetic confounding position. And if you'll let me zoom out, I just want to explain, I think in layperson's terms, what genetic confounding is all about with respect to these associations. So to say that this association is confounded by genetics, what you're saying is there are genes that cause ADHD in offspring, and those same genes are causing moms to take more acetaminophen while they're pregnant. Which is another way of saying that these same genes are causing moms to have more fevers, more headaches, more minor aches and pains, the indications of use for acetaminophen. And so if that is true, of course there's going to be a link between acetaminophen and ADHD, but it's really the genes that are causing the ADHD. That's the hypothesis. Dr. Ness did not ignore this hypothesis. Dr. Ness treated it very extensively in the expert report. She did not take into account a study that came up after what she did, which she said was highly relevant or would be relevant, and then came in and was negative to what she said, and she didn't take it into account. Now why isn't that? Without law, enough for the judge to say she was picking and choosing, and therefore she should be discounted. In other words, let me just put it. She says study B should be relevant. Study B comes in negatively, and she doesn't take it into account. Can a district judge say, therefore this person is not a qualified expert? Well, I don't think a district court can say that she's not qualified. You can certainly make an accusation of cherry picking if someone ignores a relevant study. Altfist came out after her expert report. It was put before her while she was testifying under oath because it came out that day. She had no opportunity to evaluate it. I actually think the Altfist study proves that the focus of the district court was impermissibly on conclusions as opposed to methods and principles, because Dr. Ness analyzed all of the available evidence that she had before her when she prepared her report. Now let's talk about Altfist 2024. I want to say, Dr. Ness's qualifications are less strong than Dr. Bacarelli's, and again, we're trying to decide what a district court that has a good deal of discretion can do. I'm just asking, can't a district court, looking at the level of qualifications and then looking at this particular problem, which at least it is a problem, say, I don't think this was a qualified expert? That's my question of, again, trying to say, what is it we can do and not do in these scientific situations? I totally take your Honor's questions. There are very few experts who are as qualified as Andrea Bacarelli, so it's no knock on Dr. Ness, I think, for you to have said what you said, but she is an extremely esteemed epidemiologist with a long history of looking at these kinds of problems. The district court didn't exclude her under 702A. It was only 702D, so I think you have to look at the opinion that's actually in front of you. I don't think that she can be faulted methodologically for not having a time machine. But I also think if you look at the Altfist study, there's a premise in your Honor's question that doesn't follow. You say Dr. Ness said she was concerned about confounding. She did candidly admit that. She gave a mathematical proof for why she didn't think confounding was the most likely explanation. She looked at all of the available evidence that she could have at the time. And then Altfist comes out. What did the district court do? There was no testimony from any expert, not their expert, not our expert, on Altfist. But the district court clearly interprets the study for itself. It clearly read the study and said, this is what I think the study is saying. That has to be outside of a gatekeeper's lane. Yeah, that seems, in other words, just to be very clear about the timing here, the Altfist study had not been published at the time that Dr. Ness wrote her report. Correct. It came out on the very day of her deposition. Correct. And she was asked to comment on it. I suppose understandably was not prepared to do that, right? Also correct. But again, this goes back to my question about how we deal with evolving scientific studies. What should have happened then? I mean, there are a number of possibilities. Dr. Ness might have submitted a supplemental report or a supplement to her deposition answers. That may be a legal decision, a tactical decision, rather than a decision by a witness in that circumstance. But that could have happened. Or there could have been some further exploration of that study by asking for supplemental briefing or supplemental analysis of that from the district court. But what you are saying is, what should the judge have done rather than read the study herself? And I guess that not just in terms of what the district court's role is, but also we've had several, on both sides, references to other stuff that's come out since, as if we should go and read it and take that into account. So what should the district court have done at that point? I think there are a number of possibilities that would have been within the district court's sound discretion. One possibility, which is the one that we advocated for, is take the record that exists before you and see if Dr. Ness reliably applied her methods and principles. I do think the district court would have had discretion to say, no, I don't want to do that. I want to explore all this more robustly. A district court always has discretion under Daubert to call an expert in for live testimony. That never happened here, not in the first appeal and not with respect to the second appeal. But I think Judge Coate would have been well within her discretion to say, Dr. Ness, take the time you need to properly consider this new, complicated body of scientific evidence and now I want to hear from you. We're going to have testimony on this date. That would have been. Is that on her or is that on you or is that on them? I mean, who's supposed to tell the district judge to do this or don't do this? I think it's on the side that is going to advocate that it's an unreliable application of methods and principles for Dr. Ness to testify. So in this case, I would put the onus on them. We were willing to stand on the record that was complete at the time that we submitted our briefs. I think the district court's correspondent could have called Dr. Ness in or they could have asked for it. Those would have been the appropriate courses of action. Or does it depend on how clear the second study is? I mean, that's another way of saying, you know, if you find something that really then came in and said, this is all wrong, that might be different from something which casts doubt on what was done before. I don't know. I think that is spot on accurate and where I was going before with my answer to you, Your Honor, is I don't agree, Dr. Ness doesn't agree, and I think lots of experts don't agree, that Olkvist actually replicates Gustafson. It doesn't report the same risk. I mean, how do we know that she doesn't agree with it, that Olkvist doesn't? I mean, she didn't give any... She gave... She has a comment on it. There was no supplemental... She gave some testimony under oath, literally looking at Olkvist for the very first time, and she immediately found... You're saying you're already kind of qualifying. Understandably, she didn't have a substantial amount of time to look at it, so no one's going to... Or at least I would not hold it against her that in that moment, perhaps she didn't give a fulsome response or what have you, but you're saying she agrees that it doesn't really undercut what she said before. Well, she hasn't. She has not testified you're correct, and that's not in front of you. The Dr. Baccarelli Navigation Guide analysis is in front of you through a supplemental 28J letter. The study, Olkvist, is criticized there for extreme exposure misclassification bias. It's reporting 7.5% of moms taking acetaminophen in that study. The actual background that we believe exists and that Gustafson would say exists is almost an order of magnitude more than that. It doesn't report a dose response like Gustafson. Gustafson shows that the highest users of acetaminophen had more than double the risk of ADHD, and then it attenuates the results to the null after the sibling control. That's not what Olkvist is reporting. So there are a lot of material differences between Gustafson and Olkvist, and a lay district court judge and a lay lawyer at a podium at the Second Circuit isn't qualified to weigh that study. You need actual credentialed scientists to speak about scientific evidence. I think that that is a basic tenet of Rule 702. All right. Thank you very much, John. Thank you, Your Honors. Thank you, Your Honors. Judge Coate focused on two specific flaws in Dr. Ness's opinions. One, the same flaw that she said was an independent basis besides transdiagnostic in the first case, which is genetic confounding, and the second is temporality. I want to take each in turn, and then I want to talk about the navigation guide which counsel mentioned. On genetic confounding, I think we've heard the discussion. The Olkvist study was almost requested by Dr. Ness. She said when she acknowledged the seriousness of Gustafson, she said, well, if there was another study that came and confirmed that, that might make me rethink things. And, of course, that's exactly what happened. I agree with you, Judge Lee. She didn't need to necessarily answer questions in the moment. But in answer to your question, Judge Lentz, who is it on? It's on the party that bears the burden of showing by a preponderance of the evidence under the amendment 702. Well, that's not to be — I understand that point, but — and it troubles me. But at the same time, I also have a problem with a lay judge then saying, I can read this for myself and conclude that this is exactly what Dr. Ness asked for, without hearing either — either, you know, asking what she thinks now or calling her in to testify about it or giving you an opportunity for a further deposition after Dr. Ness has had an opportunity, et cetera. Well — You know, to just say, well, I know. I can do this. I don't think that I could. I'd say two things about that. One, the plaintiffs tried to have it both ways, because although they didn't ask the supplement the expert opinion, or they didn't — and they didn't ask for a hearing, they said, we don't need a hearing, what they did was they still briefed the issue in front of her. So they put it in front of her. Number two, Judge Coates said, I would have reached the same decision regarding Dr. Ness's reliability even if all of this hadn't been published. And that's —  So then we can move on to the other two. So I'd like to talk about temporality now. Number one, this is an egregious example of exactly the kind of cherry-picking that the Court found problematic in Daniels v. Zell. What does Dr. Ness say? She says the association is the strongest in the second and the third trimester. But she also looks at Lieu 14, which found an association in the first and the second, but not the third. She looked at Weisstrom, which found an association in the first and the second. Yeah, but you know what? But isn't she — It's all over the map. Excuse me. Isn't she in a trap of the district judge's making? Doesn't Dr. Ness say, actually, I wouldn't have done any of this if it were not that the district court sort of insisted on this kind of analysis in what I think is an erroneous approach to temporality in the first opinion? Because it seems to me that the — now, you can correct me. If you have a reference somewhere where someone says that the way you decide temporality, which, after all, is not really a factor, it's not one thing to be weighed very much, it's a precondition. If you don't have temporality, you don't have anything, right, under the Bredford Hill. And the reason you don't have it is because if it turns out that the guy had lung cancer before he started smoking, then obviously the smoking didn't cause — right? Now, none of these children had symptoms of any sort before their mother ingested acetaminophen. So what the judge says about temporality is we have to know something that I think it's conceded by all parties we don't know, which is exactly what the mechanism, the biological mechanism might be that would link the acetaminophen to causing something that will have the effect of these symptoms. And once we know that, that might be something that occurs at a certain developmental stage. And so the acetaminophen has to have been taken before that hypothetical moment that we don't know what moment that is, right? And if that's the case, this case is over and has been over before it started because you could never satisfy that requirement. And so Dr. Ness says explicitly, I don't think that's how you do temporality. Now, unless you're going to tell me that then she goes on to disqualify herself, Ness, by trying to satisfy the district judge, and she shouldn't be doing that. She should say, well, if you're right about this, then I haven't got much to say, but you're just wrong about it. Well, I think we can all agree temporality means at a baseline that you need to be able to determine with some degree of reliability that the disorder that you're complaining about was somehow in, you know, that you first had the agent that caused that, which is, of course, one of the problems with, like, the cord blood study. It doesn't tell you anything about what happened in pregnancy. Why don't you say that it doesn't matter if the expert got in a jam because of something that the court said or did, but when the court said or did that, and that was irrelevant, if the expert then does something that undercuts the expert as an expert, that still undercuts the expert as an expert, you know, the court may have laid a trap, and that may be wrong, but if at that point the expert says, for example, I lied about having a degree, that still is relevant, isn't it? Your Honor, I couldn't have been any more eloquent than you, but I would add one minor point, which is Dr. Ness chose to put great weight on temporality. The district court didn't make her do that. The district court may have said, we need to understand temporality. She then doubles down and says, I'm putting great weight in the second and the third trimester. The FDA says it's inconsistent. Chen says it's in the first trimester. You know, Weisstrom says it's in the first or the second trimester. She chose to say, I'm putting great weight on this. The last thing I'd like to just address in the last few minutes is this navigation guide, which comes up both in the original opinion, but also, as counsel cited in this very recent article by Baccarelli. A navigation guide is not a scientific weighing of the Bradford Hill elements. So under the court's president, Daniel Struzell, it doesn't even fly. Number two, what it does is it simply ranks the studies, but it ranks the studies inconsistently. And for example, it downplays Alquist. It downplays some of the diagnostic studies. It elevates the symptom studies. But most importantly, a navigation guide has never once been used, never, to determine causation for a drug and an illness. Even the three examples that they provide in their brief, I think it's page 49, are examples in environmental exposure areas. It is not intended to suffice for a Bradford Hill analysis. Can I ask a question about that? I see that point. I understand it. But why would that be so? In other words, if that is a methodology that works, I mean, after all, a drug effect is an environmental factor, right? It's something other than a genetic inevitability. It is something from the environment that triggers a certain response. So if it works for a chemical in the air, why doesn't it work for a chemical in the body? I don't think it works. First of all, I don't know that it is intended to establish causation. It is there for regulatory agencies in terms of their policymaking. Causation, we understand, at least in the case law, requires the kind of rigor of a Bradford Hill analysis where you weigh all of the different factors. If all you're doing is looking at 25 studies and picking the five that you think are the highest quality, which, by the way, I think are completely cherry-picked, and I think that's what the Court found. But even if you pick the five highest quality, those are just studies looking at discrete areas and not the comprehensive. The difference that you're focusing on is not the difference between something in the air and something in the body. What you're saying is navigation guides are basically not causation methodology, are not appropriate for causation methodology. That is correct. The last thing I want to make, just to take Judge Lee's invitation to say the last thing I was going to say, is I understand we had a maybe disagreement about dose response, how important it was or not. Judge Cote did not place great weight on dose response when she rejected Dr. Baccarelli. She said transdiagnostic comes out of thin air here. It's not scientifically supported and methodologically supported. Genetic confounding he hasn't properly addressed, and he has misrepresented the consistency. You're addressing the last case. Yes, I was just responding to that permission. Thank you, Your Honor. All right. Thank you very much. Any more questions? Thank you. I understand. Thanks. Thank you, Your Honors. I'll try and be brief. Let me just quote you from Rothman's textbook on modern epidemiology. Temporality rules out causality only if we know that X never occurred before Y in studies showing an association between X and Y. We don't know that here. That's from the seminal textbook that every first year PhD epidemiologist gets. That's why the Alimany meta-analysis says that the temporality factor of Bradford Hill is satisfied for these associations. Of course Dr. Ness placed great weight on temporality, to your point, Judge Lynch. It's the one Bradford Hill factor that is absolutely indispensably necessary. It's an on-off switch. If you don't have temporality, you stop. So yeah, she placed great weight on it. It doesn't matter that Judge Cote didn't make her place great weight on it. She did it because she's a good epidemiologist. She knows that that's a really important Bradford Hill factor. It's the only indispensable one. If you look at the Lew 2014 study, all of the results by trimester are positive. All of them. It's just some are not statistically significant because of the sample size. This is actually an error that pervades the district court's opinion, statistical significance. You can look at the Rothman textbook again. He describes it as completely fallacious to say that results are inconsistent with each other just because some are positive and statistically significant and some are positive and statistically insignificant. Let me quickly turn to the navigation guide. You just heard that Dr. Paccarelli has published this navigation guide with three other respected co-authors. It's been subject to peer review. It's looking at this association and it says it is the gold standard for assessing causality robustly. Why does it say that, actually? Judge Lynch, this goes to a point that you were talking about before with the Bradford Hill methodology. It is a little squishy. It is subject to a lot of judgment calls. The reason Dr. Paccarelli and a lot of modern epidemiologists prefer the navigation guide is it's designed to try and eliminate some of that. Some of it. Not all of it. There's still going to be a lot of judgment calls. But Dr. Paccarelli and his co-authors set forth a priori the factors that they said were going to make a study higher or lower in their rates. Now, you have to trust them to be good epidemiologists and actually mean what they say when they set out those factors a priori. But they're trying to bind themselves. They're trying to be like Ulysses tying himself to the mast to not succumb to the temptation of cherry picking. That's why the navigation guide is so preferred by modern epidemiologists. So you have peer reviewed publications saying that it's a good method for assessing causality. Dr. Paccarelli did it. We're talking about the prior appeal. And the district court said it's not a method for assessing causality. There's no support anywhere for that. Nowhere. I'm happy to cede that time. All right. Thank you. We'll take that 15 seconds. Thank you, Your Honors. Thank you. Thank you both for a very eloquent argument. Yes. Thank you very much. We will take both cases under advisement.